UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| In re:<br><br>KCST USA, INC.[1]<br><br>Debtor | Chapter 11<br><br>Case No. 17-40501 (EDK) |
|---|---|

**MOTION BY DEBTOR AND DEBTOR-IN-POSSESSION FOR ENTRY OF AN ORDER (A) AUTHORIZING POSTPETITION FINANCING ON A PRIORITY SECURED BASIS; (B) SCHEDULING INTERIM AND FINAL HEARING ON FINANCING; AND (C) GRANTING RELATED RELIEF
(REQUEST FOR EXPEDITED DETERMINATION)**

Pursuant to Sections 363 and 364 of the Bankruptcy Code, Federal Rule of Bankruptcy Procedure 4001 and MLBR 4001-2, KCST USA, Inc. (the "Debtor"), the debtor and debtor-in-possession in the above-captioned proceeding, respectfully requests that this Court enter an Order (A) authorizing the Debtor to obtain post-petition financing in an amount up to $860,000 secured by a lien on the Debtor's assets, pursuant to the terms of a Term Note and Security Agreement (the "DIP Loan" or "DIP Loan Agreement") between the Debtor and Axia Net Media Corporation ("ANMC"), (B) authorizing the Debtor to borrow the sum of $465,000 on an expedited basis (the "Interim Financing") for the expenses described in this motion and the budget (the "Budget") attached as Exhibit B, (C) scheduling an interim and final hearing (the "Final Hearing") with respect to the approval of the DIP Loan and related documents as soon as practicable, and (D) granting certain related relief. A copy of the proposed Term Note and Security Agreement are attached hereto as Exhibit A.

---

[1] f/k/a AXIA NG NETWORKS USA, INC. The last four digits of the Debtor's federal tax identification number are 4617. The Debtor's address is 300 Baker Avenue, Concord, Massachusetts 01742.

As set forth in greater detail herein, the loan facility will provide the funding essential to operate the Debtor's business. In further support of this motion, the Debtor states as follows:

### I. FACTUAL BACKGROUND

1. On March 22, 2017 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Massachusetts (the "Court").

2. The Debtor continues to manage its business and financial affairs as a debtor-in-possession in accordance with Sections 1107 and 1108 of the Bankruptcy Code.

3. Neither a trustee nor an official committee of unsecured creditors has been appointed in this case.

4. The Debtor, a Delaware corporation formed in January 2010, is a provider of telecommunications network operations and support services and solutions and is experienced and skilled in the administration, management, maintenance, provisioning, performance, and sale of third party access to complex network systems. The Debtor's former parent, ANMC, is a global provider of telecommunications sales and support services.

**A.    History of the Debtor's Business**

5. The Debtor derives substantially all of its income through sales, service, and support associated with the operation of a state-owned broadband network system serving western and central Massachusetts.

6. In July 2010, the Massachusetts Technology Park Corporation, an independent public instrumentality of the Commonwealth of Massachusetts doing business as the Massachusetts Technology Collaborative ("MTC"), was provided approximately $90,000,000 in federal and state funding to build the MassBroadband 123 Network (the "123 Network"), a 1,200

mile fiber optic network intended to bring high-speed internet access to over 1,300 facilities in 124 western and central Massachusetts communities. The project contemplated over 1,000 miles of newly constructed aerial, buried and underground fiber optic cables.

7. In March 2011, the MTC put the project out to public bid and, in June 2011, G4S Technology, LLC ("G4S") was selected as the design-builder.

8. In March 2011, the Debtor and MTC executed a Network Operator Agreement ("NOA"), pursuant to which the Debtor agreed to be responsible for all aspects of management of the 123 Network, including sales and support services. MTC, in turn, agreed to be responsible for the design and construction of the 123 Network.

9. The 123 Network provides critical technological support for many public and private institutions in the Commonwealth. The community anchor institutions ("CAI") that receive internet service from the 123 Network include hospitals, police stations, fire stations, municipal governments, and schools.

10. The Debtor has operated the 123 Network at a substantial loss from its inception because MTC did not construct and deliver the 123 Network to the Debtor in accordance with the NOA and related Ramp-Up Plan.

11. The Ramp-Up Plan contained a proposed schedule for completion of the network in segments and turnover of such segments to the Debtor. Specifically, the Ramp-Up Plan divided the network into thirty four (34) segments and provided for the segments to be delivered to the Debtor as they were completed over a twelve (12) month period ending June 30, 2013. This gradual roll-out of the network was designed to provide the Debtor with an opportunity to inspect the network as it was built and to secure customers for each completed segment.

12. MTC did not deliver the project to the Debtor in accordance with the Ramp-Up Plan.[2] Rather than delivering the network in installments over a twelve month period, MTC delivered the vast majority of the network all at once in January and February 2014. This manner of delivery impaired the Debtor's ability to inspect the network and to connect customers in an orderly manner.

13. In addition to delays in delivery of the network, MTC also did not connect the network to the agreed upon number of CAI's. The NOA contemplated that MTC would connect the network to 1,392 CAI's. In fact, MTC only connected to 944 of the CAI's.

14. In addition to only connecting to 944 CAI's, only 600 CAI's contracted to use the network. As a result, there is less than one-half of the anticipated revenues from CAI customers.

15. As a consequence of the foregoing, the Debtor has realized the revenues, and experienced the losses, set forth below:

(i) for the year ending December 31, 2014, the Debtor had revenues of $1,189,782 and a net loss of $3,062,349;

(ii) for the year ending December 31, 2015, the Debtor had revenues of $2,128,402 and a net loss of $3,520,198;

(iii) for the seven months ending July 31, 2016, the Debtor had revenues of $1,346,117 and a net loss of $2,395,092.

16. At the present time, the Debtor projects approximately $2,900,000 in annual revenues, half of which is from CAI's, and approximately $5,700,000 in annual operating expenses, leaving an operating deficit of approximately $2,800,000.

---

[2] There were substantial disputes between MTC and G4S arising from the construction of the 123 Network. These disputes resulted in litigation, see *G4S Technology, LLC v. Massachusetts Technology Park Corporation*, case no. CV 14-02998-BLS2 in the Suffolk County Superior Court, Business Litigation Session.

4

17. In the summer of 2013 and in January 2014, the Debtor notified MTC that it deemed MTC to be in material breach of the NOA. In early 2014, the Debtor informed MTC of the need to modify the NOA to reflect the delays and reduced number of CAI's contracting to use the network. In response, rather than discussing modifications to make the network viable, MTC filed suit in July 2014 against the Debtor in the Suffolk County Superior Court, Business Litigation Session, case no. CV2014-02410-BLS2, for anticipatory repudiation under the NOA and related relief, including issuance of a mandatory injunction (the "MTC Action"). On or about August 11, 2014, the Superior Court entered a preliminary injunction requiring the Debtor to continue to perform under the terms of the NOA pending completion of arbitration as provided for under the NOA. The arbitration has not yet commenced. In any case, the Debtor's financial circumstances have continued to worsen, necessitating the filing of this case.

**B.    Debtor's Relationship to ANMC.**

18. ANMC is based in Calgary, Alberta and was the shareholder of the Debtor until June 22, 2016, when ownership of the Debtor underwent a structural change. At that time, the Axia NG Networks Trust (the "Trust") was formed and became the legal owner of the Debtor's stock. The operating trustee of the Trust is FSM Capital Management, LLC, which manages the Debtor. ANMC is the sole beneficiary. The change in ownership and control was approved by the Federal Communications Commission on July 29, 2016.

19. Also on June 22, 2016, the Debtor entered into a Transitional Services Agreement with ANMC's affiliates, Axia Supernet Ltd. And Axia Connect, Ltd. (the "ANMC Affiliates"). Pursuant thereto, the ANMC Affiliates agreed to provide technical, operational, and administrative support to the Debtor for ongoing operations during a transition period.

20. In connection with the execution of the NOA, ANMC executed and delivered a $4,000,000 limited guaranty in favor of MTC. While ANMC has not made any payments directly to MTC on its guarantee, it has made substantial advances to the Debtor to help fund the operating losses resulting from MTC's failure to deliver the 123 Network in accordance with the NOA and Ramp-Up Plan. As of the Petition Date, the Debtor owed ANMC approximately $18,000,000 on account of such advances.

**C.    The Debtor's Operations and Assets.**

21. The Debtor has six (6) full-time employees who perform sales, service, technical, and administrative functions. The Debtor's president is Terrence Fergus and Stephen Darr of Huron Consulting Services has been appointed Chief Restructuring Officer.

22. As of the Petition Date, the Debtor's principal assets consisted of the following: (i) cash in the approximate amount of $110,000; (ii) accounts receivable and prepayments totaling approximately $314,000; (iii) property and equipment, consisting principally of technology hardware and broadband network rights, having a book value of $98,565; (iv) intangible assets consisting of computer software and having a book value of $6,562.

**D.    The Debtor's Liabilities**

23. The Debtor has no secured indebtedness. The Debtor was previously an obligor on indebtedness to the Bank of Montreal ("BofM") in the approximate amount of $2,000,000. Upon information and belief, BofM has released any liens it had on the Debtor's assets and discharged the indebtedness.

24. As set forth above, the Debtor entered into two prepetition lending agreements with ANMC. The total amounts outstanding on the Notes is approximately $18,000,000.

25.     The Debtor has other unsecured indebtedness, consisting of accounts payable and accrued liabilities, in the aggregate amount of approximately $1,000,000. Of this amount, accrued liability to affiliated entities totals approximately $200,000.

## II.     THE CHAPTER 11 FILING

26.     The Debtor continues to suffer substantial operating losses under the NOA. ANMC has agreed to provide a postpetition loan to the Debtor, in the amount of $860,000, to fund operations for a thirteen (13) week period while the Debtor explores whether a modification to make the network viable can be achieved. Unless such a modification can be achieved, the Debtor will not be able to continue operating the network and will need to reject the NOA.

## III.    THE DIP LOAN

A.     **General.**

27.     By this motion, the Debtor proposes to enter into the DIP Loan Agreement with ANMC on the terms set forth therein in detail. In summary, the principal terms of the DIP Loan Agreement are as follows:

- Interest: Fixed interest rate of five percent (5%) per annum based upon a 360 day year, payable upon loan maturity, with a default rate of interest of seven percent (7%).

- Maturity: The earlier to occur of: (a) June 19, 2017, and (b) confirmation of a plan of reorganization (the "Maturity Date").

- Security/Priority: Security for the DIP Loan Agreement will consist of a security interest in all of the Debtor's assets including but not limited to accounts receivable, inventory, and other tangible and intangible personal property. The collateral expressly excludes any so-called bankruptcy avoidance actions under subchapter 5 of the Bankruptcy Code. Additionally, ANMC shall have an administrative expense priority pursuant to Section 503(b) of the Bankruptcy Code.

- Required Payments: None until Maturity Date.

- Loan Funding: Funding shall be made available in accordance with the attached Budget and subject to Court approval.

- Mandatory Prepayments: None.

- Events of Default: (a) the dismissal or conversion to Chapter 7 of the Debtor's Chapter 11 bankruptcy proceeding; (b) the occurrence of the Maturity Date of the DIP Loan, unless the DIP Loan has been paid or is paid in full on the Maturity Date; (c) the appointment of a trustee or examiner of the Debtor; (d) the grant of relief from the automatic stay to any creditor to exercise secured party rights with respect to a substantial portion of the Debtor's assets; (f) reversal, vacation, or modification of the Court's order approving the DIP Loan Agreement; (g) the grant of a lien upon the Debtor's assets senior to the lien granted to ANMC.

28. The terms of the DIP Loan Agreement have been negotiated in good faith and reflect the Debtor's exercise of its business judgment. The DIP Loan Agreement does not contain any of the provisions set forth in MLBR 4001-2(c).

29. The Debtor believes that it would be unlikely to secure alternative financing, other than through the DIP Loan Agreement, unless a new lender were granted similar or better terms. The terms of the DIP Loan are believed to represent the best available financing terms for the Debtor given its present financial condition, ongoing losses, and debt structure.

30. The Debtor does not otherwise have sufficient available sources of working capital to carry on its operations. The Debtor's ability to pay operating expenses is essential to the Debtor's continued viability.

31. Without the DIP Loan, the Debtor's continued ordinary course operations would not be possible, and serious and irreparable harm to the Debtor and its estate would result. The DIP Loan Agreement will therefore preserve, maintain and enhance the value of the Debtor's assets while the Debtor explores alternatives for addressing the issues associated with the NOA.

IV. **REQUEST FOR INTERIM AND FINAL APPROVAL OF THE DIP LOAN AGREEMENT**

32. Section 364 of the Bankruptcy Code allows a debtor to (a) obtain unsecured credit in the ordinary course of business, (b) obtain unsecured credit out of the ordinary course of business, (c) obtain credit with specialized priority and (d) obtain secured credit by granting a

secured lien on property of the estate. If a debtor-in-possession cannot obtain post-petition credit on an unsecured basis, the Court may authorize the obtaining of credit or the incurring of debt repayment of which is secured by liens on the debtor's property.

33. Courts will generally evaluate the facts and circumstances of a debtor's case, and will grant significant weight to a debtor's business judgment regarding the necessity for obtaining the requested financing. *See In re Ames Dept. Stores, Inc.* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).

34. The Debtor believes that ANMC is a good faith lender and, although ANMC is an insider, the loan sought is on fair and reasonable terms, there is no improper purpose, and the terms and conditions of the loan have been fully disclosed. Given the financial condition of the Debtor, its continuing operating losses, and the uncertain value of its assets in a liquidation, the Debtor believes that it would be unable to secure alternative financing on an unsecured basis from a third party lender or allowable only as an administrative claim. If the Debtor was somehow able to obtain a loan from a third party secured by its assets, which is highly doubtful, the loan repayment terms would likely be more onerous than the terms agreed to by ANMC.

## V. **REQUEST FOR FINAL HEARING**

35. The Debtor requests that the Court schedule a final hearing with respect to the approval of the DIP Loan Agreement as soon as practicable following the entry of the Interim Financing order.

## VI. **NO PRIOR REQUESTS**

36. No prior request for the relief sought in this motion has been made to this or any other court.

## VI. NOTICE

37. The Debtor has served this motion by electronic mail (where available), facsimile and first class mail on ANMC, the Debtor's twenty largest unsecured creditors, the Internal Revenue Service, the Massachusetts Department of Revenue and the Office of the United States Trustee. The Debtor submits that such service is sufficient given the relief requested in this motion.

**WHEREFORE**, the Debtor respectfully requests that this Court enter an Order:

A. Finding that the notice of this motion was sufficient and appropriate given the relief requested;

B. Entering an order approving the DIP Loan on an interim basis;

C. Authorizing the Debtor to obtain final post-petition financing as is described in this motion;

D. Authorizing the Debtor to grant to ANMC senior liens and security interests against the Debtor's assets;

E. Scheduling a final hearing with respect to the approval of the DIP Loan Agreement as soon as practicable following the entry of the order approving the Interim Financing; and

F.    Granting such further relief as is just and proper.

    KCST USA, INC.,
By its proposed counsel,

/s/ Andrew G. Lizotte
Harold B. Murphy BBO #362610
Andrew G. Lizotte BBO #559609
Murphy & King, Prof. Corp.
One Beacon Street
Boston, MA 02108
Ph: (617) 423-0400
ALizotte@murphyking.com

Dated: March 22, 2017
723104